## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Debra Lynn Cherney and                    Civil No. 06-4265 (DWF/SRN)
Steven Cherney, Sr.,

                    Plaintiffs,

v.                                         **MEMORANDUM**
                                           **OPINION AND ORDER**
City of Burnsville; Officer Smith (Badge #100),
Officer Powers (Badge #119), and Jane Doe and
Richard Roe, unknown and unnamed Burnsville
Police Officers, personally and individually, and in
their official capacities as Burnsville Police Officers,

                    Defendants.

_____

Gregory S. Bachmeier, Esq., and Phillip F. Fishman, Esq., Fishman Binsfeld &
Bachmeier, PA, counsel for Plaintiffs.

Jon K. Iverson, Esq., and Susan M. Tindal, Esq., Iverson Reuvers, LLC, counsel for
Defendants.

_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by

Defendants City of Burnsville; Officer Smith (Badge #100); Officer Powers (Badge

#119); and Jane Doe and Richard Roe, unknown and unnamed Burnsville Police Officers

(collectively, "Defendants").  In their Complaint, Plaintiffs Debra Lynn Cherney and

Steven Cherney, Sr. ("Steven Sr.") (collectively "the Cherneys"),[1] assert several causes

_____

[1]     For the sake of simplicity, the Court refers to members of the Cherney family
throughout this Order by their first names.

of action against Defendants relating to the officers' response to a 911-call made on December 19, 2005, and to a pat-search performed by Officer Smith on Debra. Specifically, the Cherneys assert the following causes of action:  assault (Count I); battery (Count II); intentional infliction of emotional distress (Count III); negligent infliction of emotional distress (Count IV); a 42 U.S.C. § 1983 claim based on excessive force (Count V); a 42 U.S.C. § 1983 claim based on failure to prevent a constitutional violation (Count VI); a 42 U.S.C. § 1983 *Monell* claim (Count VII); conspiracy to use excessive force in violation of 42 U.S.C. § 1983 (Count VIII); negligent training (Count IX); and loss of consortium (Count X).  Defendants filed a Counterclaim for defamation on behalf of Officers Smith and Powers.  Defendants now move for summary judgment on all of the Cherneys' claims and on their claim for defamation.

The key issues in this case relate to the disputed facts regarding Officer Smith's pat-search of Debra's groin area.  For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND

On December 19, 2005, Debra and Steven Sr. had an argument in their home in Burnsville, Minnesota.  One of Debra and Steven Sr.'s two minor sons who lived in their home phoned Steven Cherney, Jr. ("Steven Jr.") and indicated that Debra and Steven Sr. were arguing.  Steven Jr. is Debra and Steven Sr.'s son and lives outside the Cherneys' home with his wife, Melissa Cherney.  Melissa was with Steven Jr. when he received the call.  Melissa then called 911.  Melissa told the 911-operator that her mother-in-law and father-in-law were screaming and breaking things, and that her father-in-law was

threatening suicide.  The 911-operator asked Melissa whether Steven Sr. had any weapons.  Melissa said that she believed he had guns, but that she did not think he had any in his hands.  She said her belief was that Steven Sr. was threatening to go get a gun.

The 911-operator then dispatched Burnsville Police to Debra and Steven Sr.'s home.  The dispatch operator stated, "RP is not on site, she's on the phone with her brother-in-law.  Apparently his parents are there breaking things.  The male is threatening to harm himself.  They do have access to guns in the house."  (Affidavit of Susan Tindal ("Tindal Aff."), Ex. 9 at 2.)  Officer David Powers and Officer Matthew Smith,[2] among others, responded that they could help and headed towards Debra and Steven Sr.'s home.  The dispatch operator then reported, "Apparently[3] the father has been stating that he was going to go get the gun."  (*Id.*)

The 911-operator then asked Melissa to hand her phone to Steven Jr., who at the time was on another phone speaking with one of his brothers who was at Debra and Steven Sr.'s home.  The 911-operator asked Steven Jr. where the guns were in the house.  Steven Jr. said that "[his] brothers each have one in their case in the bedroom and . . . [his] dad has one in his case in his bedroom . . . . So they're hunters."  (Tindal Aff., Ex. 5 at 4.)  The 911-operator asked, "They're hunting guns?"  (*Id.*)  Steven Jr. responded, "Yeah."  (*Id.*)

---

[2]     Officer Smith has since become a Sergeant for the Burnsville Police Department.

[3]     The Court is unclear as to what the dispatcher meant both here and above as to the use of the word "Apparently."  Notably, the officers did not inquire further as to the meaning of the word either.

The dispatch operator then reported the following to the responding officers:

I'm now getting a different story from the RP's husband. He's on the phone with his brother who is at the residence. Apparently it was not a physical fight. Just verbal. There were things that were broken in the house and there was a mention about the guns. Apparently there are guns in each of the bedrooms and they're all meant for hunting.

(Tindal Aff., Ex. 9 at 3.)

Six officers, including Officers Smith and Powers responded to Debra and Steven Sr.'s home and set up a perimeter around the home with their guns drawn or in a low-ready position.[4] Officers Smith and Powers were located in the front of the home. When the officers ordered the Cherneys out of the home, Steven Sr. exited and walked to where the officers were. Officer Powers conducted a pat-search on Steven Sr., handcuffed him, and allowed him to sit in the back of a squad car to stay out of the cold.[5]

During this time, Debra was coming in and out of the house yelling. Also, Debra called 911 and in an irate manner ordered the operator to "call those police to get their guns put away." (Tindal Aff., Ex. 6 at 1.) Debra reported that it was not an emergency and threatened to call the news if the operator did not do something right away. The operator explained to Debra that the officers were responding in the manner that they were because of the nature of the initial 911 call, which included a report that there were guns in the house. The operator told Debra that the police needed to talk to her and that

---

[4]   The Cherneys do not base any of their claims on the fact that the officers formed such a perimeter, that the officers had their guns drawn, or that the officers ordered the Cherneys out of the house.

[5]   Steven Sr. asserts that Officer Powers did not pat-search his groin area. Officer Powers disagrees and asserts that he did pat-search Steven Sr.'s groin area.

she should go outside and explain the situation to the police.  Debra exited the house and

walked approximately 200 feet to the officers.  While walking toward the officers, Debra

continued to yell and demanded to speak to a sergeant.  At the time, Debra was wearing a

T-shirt, a hip-length jacket, and form-fitting jeans.

Officers Smith and Powers contend that because of Debra's demeanor and the

prior report about guns, they decided to pat-search Debra for weapons to ensure

everyone's safety.  Officer Powers patted Debra on her right side and Officer Smith

patted her left side.  The parties dispute both the manner and force used by Officer Smith

during the pat-search with respect to Debra's groin area.  Debra testified as follows at her

deposition:

> A:     I remember being tossed back and forth between the two of them
> while they searched me.  Did a very thorough search.  Pushed me
> around quite a bit.  And then [Officer Smith], he was very rough in
> my stomach area.  And he went down to my groin and actually was
> touching my pad.[6]
>
> . . . .
>
> Q:     And where did Sergeant Smith start patting you down, where on
> your body?
>
> A:     I don't remember where it started.  I know that they, you know,
> checked my back, checked my chest.  You know, basically pretty
> much everywhere.  And it didn't bother me as much until he got into
> my stomach area and was very rough.  And when he started going
> down into my groin area, it hurt.  And when I said something to
> him, he stopped, stepped away, looked at me, rolled his eyes and
> said "ma'am."  And then he proceeded to put his hand in between
> my crotch very roughly and kept it there longer than he needed to.

---

[6]     Debra asserts, and Officer Smith acknowledges, that she told Officer Smith that
she was menstruating at the time.

. . . .

Q:     Okay.  And where is the first contact that you felt from [an] officer?

A:     I don't remember where the first contact was.  Where it really became a problem was when they became very rough with my stomach.  This officer became very rough in that area.

Q:     When you say rough, did he pat you harder on your stomach than any other parts of your body?

A:     Yes.

Q:     And I'm sorry.  We were kind of talking over each other there.  You said it wasn't patting.

A:     It didn't feel like patting.

Q:     What was it then?

A:     It was a lot of pressure.  I'm not really sure.  I couldn't see.  It hurt.  It was uncomfortable.

Q:     Did you see what side of his hand he was using; was it his palm or the outside?

A:     It was his palm.

. . . .

Q:     How do you know he used his palm if you couldn't see his hand?

A:     When he was right here, I could see his hand.  I couldn't see it when it was in my back or – and I could feel it.  Your hand doesn't bend backwards.  And it was a cupping.

Q:     And you say he touched your groin area twice?

A:     Yes.

. . . .

Q:     The first time that Sergeant Smith's hand was in your groin area, how long was it there?

A:     It was briefly because he stopped and stepped away.

Q:     And the second time, how long was that?

A:     It was, I felt, longer than it needed to be.  Shouldn't have happened a second time at all.  Maybe a couple of seconds.

(Tindal Aff., Ex. 3 at 39-43.)[7]  Officer Smith, on the other hand, testified as follows at his

deposition:

Q:     Could you just describe everything that you did as far as your frisk on the left side of her body.

A:     Well, I checked her jacket, just feeling the jacket itself; make sure there was no weapons in there.  The arms.  And then I went, and with the back of my hand, I checked around her waistband, which is a common area for people to hide weapons.
       I then checked her leg – well, then eventually checked her leg from her ankle up to her groin area; and then with the back of my right hand, checked her groin area.

Q:     Okay.  Why do you check her waistline with the back of your hand?

A:     It can be considered a sensitive area with the opposite sex, so you use the back of your hand so that it's not construed as being something sexual.
       I can feel a weapon with the back of my hand just as well as the front.  And so that's how we're trained to do it.

       . . . .

---

[7]     Officer Powers' on-scene radio confirms that Debra complained about Officer Smith touching her stomach, that Officer Smith responded, "Ma'am.  Relax.  Okay[,]" and that within approximately three seconds, Debra complained that Officer Smith was, "--- pathetic."  (Tindal Aff., Ex. 8 at 3.)  In addition, Steven Sr. testified at his deposition that he saw Officer Smith use the palm of his hand when he searched Debra's groin area.  (Tindal Aff., Ex. 4 at 32.)

Q:     And is there a policy or something in place that states that you
       should be checking a female waistband, or genital or groin area with
       the back of your hand?

A:     There is no policy that says, "use the back of your hand."  That's a
       training thing.

Q:     Was there any training manual that states that?

A:     I don't recall if it's written somewhere, or if that's just how it's been
       trained.

Q:     Have you learned that at your classes that you've attended?

A:     Yes.

Q:     And do you know specifically who's taught you that method?

A:     I know A and S Training out of St. Paul was one place where I
       learned that.

Q:     Is that common within the Burnsville Police Department to search
       females, or members of the opposite sex, in that manner?

A:     Yes, I think if anyone is searching someone of the opposite sex,
       that's how they do it.  That's how we train officers to do it.

Q:     Has that been in place as long as you've been a police officer, that
       that's the proper way to search a member of the opposite sex?

A:     I believe so.

Q:     And then can you describe how you searched her groin area?

A:     Again, I used the back of my hand.  And you do it more in a
       padding motion, not a feeling motion.  I don't know how to describe
       it better.  But you just pat along that area to determine if there's a
       weapon in there.

Q:     And how many times do you think you padded her area to determine
       if there was a weapon there or not?

A:     Three, maybe.

Q:      Three pats with the back of your hand?

A:      Three or four.  That's just a guess, but, yeah.

(Tindal Aff., Ex. 2 at 39-42.)[8]

After the pat-search, Debra refused to talk to Officer Smith, but Debra did eventually talk to a female officer that was called back to the scene.  After the officers talked with both Debra and Steven Sr., the officers determined that Steven Sr. was not in danger of harming himself and that there had been no domestic crime committed.

Debra alleges that as a result of the events that occurred on December 19, 2005, she suffers severe emotional and psychological damage in the form of decreased self-esteem, night terrors, and anxiety, which has resulted in significant lifestyle changes.  Debra also asserts that her sexual relationship with her husband has changed.  The record contains an update from Dr. Albert Salazar confirming that Debra has Post Traumatic Stress Disorder ("PTSD") and concluding that the condition was caused by a situation involving the Burnsville Police.  Dr. Salazar also confirms that Debra has required medication since the events that occurred on December 19, 2005.

## DISCUSSION

### I.      Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

---

[8]      There is a factual dispute as to whether Officer Smith was wearing gloves during the pat-search.

Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Jane Doe and Richard Roe, unknown and unnamed Burnsville Police Officers

Defendants argue that the Complaint fails to state facts alleging Jane Doe and Richard Roe, unknown and unnamed Burnsville Police Officers, were involved in the events giving rise to any of the asserted causes of action, and therefore assert that all claims against these Defendants should be dismissed as a matter of law. The Cherneys

do not respond to Defendants' argument in their opposition memorandum.[9]  Accordingly,

the Court deems abandoned any and all claims against Jane Doe and Richard Roe,

unknown and unnamed Burnsville Police Officers.  *See Thomsen v. Ross*, 368 F. Supp. 2d

961, 974 n.9 (D. Minn. 2005).

## III.    Section 1983 Claims (Counts V, VI, VII, and VIII)

Section 1983 prohibits a person acting under color of state law from depriving

another person of his or her "rights, privileges, or immunities secured by the Constitution

and laws . . . ."  42 U.S.C. § 1983.  When bringing a § 1983 claim, a plaintiff must

establish (1) a deprivation of a right secured by the Constitution or laws of the

United States and (2) that the deprivation was committed under color of state law.  *Lugar*

*v. Edmondson Oil Co.,* 457 U.S. 922, 931 (1982).  In the Complaint, the Cherneys allege

several § 1983 claims based on various theories.  The Court will consider each in turn.

### A.    Count V – Section 1983 Claim

The Cherneys assert that Defendants violated Debra's constitutional rights "to be

free from excessive force, illegal searches, summary punishment, violations of due

process, and the right to equal protection of the laws."  (Compl. ¶ 38.) [10]  In their

---

[9]    The only statement even vaguely related made by the Cherneys is their assertion
that "the other Burnsville Police Officers can be held liable for failing to intervene when
Officer Smith conducted an unlawful pat down."  (Pls.' Mem. Opposing Defs.' Mot. for
Summ. J. 26.)

[10]    The Cherneys assert this claim against the officers both in their individual and
official capacities.  A § 1983 suit against an employee in his or her official capacity is
deemed to be a suit against the employer only, which in this case is the City of
Burnsville.  *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).

(Footnote Continued on Next Page)

opposition memorandum, the Cherneys focus solely on their right to be free from unreasonable search and seizure and the right to be free from excessive force. Specifically, the Cherneys assert that there was no probable cause to search Debra and that Officer Smith's alleged prolonged search of Debra's groin area constituted excessive force. Defendants disagree and assert that they are entitled to summary judgment because they are protected by the defense of qualified immunity.

Qualified immunity shields government officials as well as private individuals from civil liability under § 1983. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). A defendant is shielded from civil liability if it is shown that his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law to be decided by the district court. *Littrell v. Franklin*, 388 F.3d 578, 584 (8th Cir. 2004).

On a motion for summary judgment, the Court employs a three-part test to determine whether qualified immunity exists. *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999). First, the plaintiff must assert a violation of a constitutional right. *Id.* Second, the alleged right must be clearly established. *Id.* Third, taking the facts in the light most favorable to the plaintiff, there must be no genuine issues of material fact as to

---

(Footnote Continued From Previous Page)

The Court will address the merits of the Cherneys' claim against the City of Burnsville below.

whether a reasonable official would have known that the alleged action violated the plaintiff's clearly established rights. *Id*. If the Court determines that the facts, viewed in the light most favorable to the injured party, do not establish a violation of a constitutional right, no further inquiry is necessary. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). The Fourth Amendment protects a person's right "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 828 (2002). "The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that arise in the context of an arrest or investigatory stop of a free citizen." *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000) (quotations omitted). Here, based on the Cherneys' assertions that their right to be free from unreasonable search and seizure and their right to be free from excessive force were violated, the Court finds that they have asserted a violation of a clearly established constitutional right.

A limited pat-search is permissible upon a showing of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). The Court evaluates excessive

force claims under an objective-reasonableness test.  *Graham*, 490 U.S. at 397.  In

determining whether the use of force is "reasonable" under the Fourth Amendment, a

court must balance "the nature and quality of the intrusion on the individual's Fourth

Amendment interests" against the government's interests.  *Id*. at 396 (quotations

omitted).  The reasonableness of the use of force must be judged from the "perspective of

a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*.

(citing *Terry*, 392 U.S. at 20-22).  The reasonableness determination also must make

allowances for the fact that police officers make split-second judgments in oftentimes

tense situations.  *Graham*, 490 U.S. at 396-97.  Therefore, the United States Supreme

Court has set out the reasonableness inquiry as one that requires courts to determine

"whether the officers' actions are 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation."

*Id*. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978)).  "An officer's evil

intentions will not make a Fourth Amendment violation out of an objectively reasonable

use of force; nor will an officer's good intentions make an objectively unreasonable use

of force constitutional."  *Id*.  Several objective factors such as "the severity of the crime,

whether the suspect posed a threat to the safety of the officers or others, and whether the

suspect was resisting arrest are all relevant to the reasonableness of the officer's

conduct."  *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1081 (8th Cir. 1990).

The Cherneys assert that the officers were unreasonable in their search because

Debra did not resist arrest and she complied with police instructions.  Further, the

Cherneys assert that based on the officers' knowledge that there was no indication of

immediate danger upon their arrival—including knowing that no violence or weapons were involved—there was not a need to subject Debra to a pat-search of her groin area. In addition, the Cherneys assert that the manner in which Officer Smith executed the pat-search of Debra's groin area was unreasonable.  Specifically, the Cherneys assert that that the scope of the search was too broad because a reasonable officer would not have believed in this situation that Officer Smith's pat-search was reasonably calculated to discover a hunting rifle in Debra's groin area.[11]  In response, Defendants assert that because there is little case law addressing the constitutionality of weapons searches which include a suspect's groin area, the law existing at the time did not clearly establish that the officers' actions violated Debra's rights.  Therefore, Defendants assert that Officer Smith should be allowed to retain his qualified immunity.

The Court concludes that a limited pat-search of Debra (and Steven Sr.) was permissible under the circumstances.  The Officers responded to what the dispatch operator reported was a domestic disturbance call involving access to guns.  The dispatch operator also reported that the male involved might have threatened to go and get a gun and possibly harm himself.  In addition, and specifically as to Debra, it is undisputed that she was moving in and out of the house, yelling at the officers, and that she continued to

---

[11]    The Cherneys focus much of their argument on the fact that the officers knew that the guns referred to in the dispatch call were hunting rifles, that Debra was wearing form-fitting jeans, and that she walked approximately 200 yards from her house to the officers while carrying a cordless phone in her hand.  They argue that based on these facts, it is not reasonable to believe that Debra could have been concealing a hunting rifle in her groin area.  The Court notes that these facts are irrelevant to the inquiry here.  As Defendants point out, Debra could have been concealing a number of different weapons, not just those referenced in the 911 call.

yell at the officers as she approached them.  Because of Debra's behavior during the time just prior to and during her approach to the officers, Officers Smith and Powers were reasonable in believing that she might pose a threat to their or others' safety and they were reasonably justified in taking steps to ensure the safety of themselves and others. Therefore, the Court concludes that the seizure in this instance was lawful.

However, the Court acknowledges that certain aspects of Officer Smith's pat-search of Debra's groin area are disputed, including whether Officer Smith searched with his glove on, whether Officer Smith searched with his palm up or down, whether Officer Smith searched Debra's groin once or twice, and the length of time the search of the groin area took.  Here, the question therefore becomes, taking the Cherneys' allegations as true, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (quotations omitted).  Although it is true that "routine pat-down searches, even if they include the groin area, do not violate the Constitution just because an officer of the opposite gender conducts the search," *Greiner v. City of Champlin*, 816 F. Supp. 528, 543 (D. Minn. 1993), this is assuming that the search truly was routine and that the officer's method in performing the search was proper.  The Cherneys assert that Officer Smith's pat-search of Debra was not routine, and complain that it was the duration, the manner, and the repetition of Officer Smith's search of Debra's groin area that violated her Constitutional right.

At this stage, the Court must take as true the Cherneys' assertions that Officer Smith searched Debra's groin area with the palm and fingers of his cupped hand.  Officer

Smith testified that officers are trained to use the backside of their hand when conducting a search on a person of the opposite sex.  Viewing the evidence in the light most favorable to the Cherneys, the Court finds that it would be clear to a reasonable officer that Officer Smith's pat-search of Debra's groin area using the palm of his hand was unlawful based on the training the officers receive.  Therefore, because there are genuine issues of material fact relating to qualified immunity, summary judgment is denied as to this count.  The Court notes that in so holding, the Court is not concluding that, as a matter of law, excessive force was used.  Rather, the Court is concluding that a reasonable jury could conclude, on the facts at issue here, that excessive force was used.

### B.    Count VI – Section 1983 Failure to Prevent Claim

The Cherneys allege that "[d]efendants, in each permitting the other Defendant to encourage, allow or permit the sexual assault and illegal search, frisk and/or patdown of Plaintiff Debra Cherney and to otherwise violate the Plaintiff's clearly established constitutional rights, failed to take reasonable and required steps to prevent the other Defendants from violating the Plaintiff's constitutional rights although they had an official duty to do so."  (Compl. ¶ 42.)  Defendants assert that the Cherneys' claim must fail because they assert that Officer Smith's actions were objectively reasonable and Officer Powers did not have an opportunity or ability to intervene.

An officer has a duty to prevent the use of excessive force by other officers if the officer can reasonably do so.  *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir. 1983).  Here, viewing the evidence in the light most favorable to the Cherneys, the Court finds that Officer Powers could not have reasonably intervened in the pat-search in time to prevent

the manner in which Officer Smith conducted the search of Debra's groin area.[12]   The

search undisputedly was completed within a matter of seconds.   Further, taking the

Cherneys' allegations as true, there is no evidence in the record indicating that Officer

Powers would have known that Officer Smith was going to pat-search Debra's groin area

with his palm rather than the backside of his hand.   Accordingly, the record supports

summary judgment on this claim.

### C.      Count VII – *Monell* Claim

Under § 1983, a municipality cannot be held liable on a theory of respondeat

superior merely because it employs a tortfeasor.   *Monell v. Dep't of Soc. Servs.*, 436 U.S.

658, 690-91 (1978).   But a municipality may be liable for harm caused by the execution

of an official policy or custom that deprives an individual of his or her constitutional

rights.   *Id.*   For a municipality to be liable under § 1983, a plaintiff must prove that a

municipal policy or custom was the "moving force [behind] the constitutional violation."

*Id.* at 694.   An "[o]fficial policy involves a deliberate choice to follow a course of

action . . . made from among various alternatives[] by an official who is determined by

state law to have the final authority to establish governmental policy."   *Ware v. Jackson*

*County, Mo.*, 150 F.3d 873, 880 (8th Cir. 1998) (quotations and brackets omitted).

Alternatively, a custom "is demonstrated by:   (1) [t]he existence of a continuing,

widespread, persistent pattern of unconstitutional misconduct by the governmental

---

[12]      The Cherneys do not dispute that it was Officer Smith who searched Debra's groin area and the record reflects that the only other officer near Officer Smith at the time was Officer Powers.

entity's employees; (2) [d]eliberate indifference to or tacit authorization of such conduct

by the governmental entity's policymaking officials after notice to the officials of that

misconduct; and (3) [t]he plaintiff's injury by acts pursuant to the governmental entity's

custom, *i.e.,* proof that the custom was the moving force behind the constitutional

violation." *Id.* (brackets omitted).

The Cherneys allege that "Defendant City of Burnsville, through its employees

and police agents, have failed to properly train, supervise, and/or discipline the Police

Officers who violated Plaintiff's constitutional rights" and that "the actions of the police

officers were carried out pursuant to an unconstitutional policy, procedure, or practice of

Defendant City of Burnsville[.]"  (Compl. ¶ 47.)  The Cherneys also allege that "[t]he

unconstitutional policies of the Defendants included the policy, custom, practice and

procedure of failing to train officers to engage in safe and well-established police

procedures when conducting a search, frisk, patdown or seizure, when making an arrest,

or deciding when to pursue and make an arrest[.]"  (*Id.* ¶ 49.)

Defendants assert that the Cherneys' claim must fail because there is no evidence

in the record indicating a policy or custom that the officers followed that resulted in the

deprivation of Debra's constitutional rights nor is there evidence supporting a failure to

train or supervise.  Because the Cherneys do not address this issue in their opposition

brief, the Court deems the Cherneys' *Monell* claim abandoned.  *See Thomsen*, 368 F.

Supp. 2d at 974 n.9.

Even so, the Court agrees with Defendants on the merits.  Viewing the evidence in

the light most favorable to the Cherneys, the Court finds that they have failed to identify

a genuine issue of material fact to support their *Monell* claim.  On the record before the

Court, there is no evidence to support the Cherneys' assertion that the City of Burnsville

maintains a widespread custom or policy or lack of training or supervision regarding

conducting pat-searches of persons of the opposite sex.  The Cherneys have presented no

evidence that the City of Burnsville was on notice of the alleged constitutional violation

and was deliberately indifferent or authorized the alleged constitutional violations.

Instead, the only related evidence in the record is the testimony of Officer Smith stating

that he and other officers are trained to conduct pat-searches of the groin area on a person

of the opposite sex by using the backside of their hand.  Therefore, the Court grants

Defendants' motion for summary judgment as to this claim.[13]

---

[13]     The Cherneys separately plead a claim for negligent training in Count IX of the
Complaint, but did not address Count IX in their opposition brief.  In the Complaint, the
Cherneys allege that Defendant "fail[ed] to adequately hire, supervise, investigate,
discipline, terminate and train its employees about proper procedure, arrest procedure, the
use of force continuum, when to arrest, when to search, frisk, patdown, and/or seize,
proper policies, and overall good police practice, and by failing to take reasonable steps
to prevent its officers from engaging in sexual assault, excessive force, illegal searches,
frisks, patdowns and/or seizures."  (Compl. ¶ 56.)  Defendants do not directly address
Count IX in their moving papers but request that the Court "dismiss Plaintiffs' claims in
their entirety."  The Court concludes that Defendants have not properly briefed a motion
for summary judgment as to Count IX.  Defendants have not met their burden of showing
that there is no genuine issue of material fact and that it is entitled to judgment as a matter
of law. *See Enter. Bank*, 92 F.3d at 747.  Therefore, because the viability of Count IX is
not properly before the Court, the Court declines to grant summary judgment on that
claim.  The Court notes, however, that Officer Smith's testimony regarding training as to
pat-searches of people of the opposite sex weighs against finding negligent training.
Therefore, based on the evidence currently before the Court, it is unlikely that the
Cherneys would survive a directed verdict on this claim.

**D.**     **Count VIII – Section 1983 Conspiracy Claim**

The Cherneys allege that "Defendant Officers Smith, Powers and Jane Doe and Richard Roe were conspirators engaged in a scheme and conspiracy designed and intended to deny and deprive Plaintiff Debra Cherney of liberty-interests and the right to be free of excessive force, sexual assault, and an improper search, frisk, patdown and/or seizure guaranteed to Plaintiff under the Constitution and law of the United States." (Compl. ¶ 52.)  Defendants assert that this claim must fail because the Cherneys have not alleged facts indicating a "meeting of the minds" between any of the Defendants.

In order to prevail on a § 1983 civil conspiracy claim, a plaintiff must show, "that the defendant conspired with others to deprive him or her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999).  A plaintiff must also prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim. *Id*.  To advance past the summary judgment stage, the Cherneys must allege with particularity and specifically demonstrate material facts that the Officer Defendants reached an agreement. *See Marti v. City of Maplewood, Mo.*, 57 F.3d 680, 685 (8th Cir. 1995).

Viewing the evidence in the light most favorable to the Cherneys, the Court concludes that they have presented no specific material facts, circumstantial or otherwise, that the Officer Defendants formed an agreement to violate Debra's constitutional rights. Therefore, summary judgment is appropriate on this claim.

**IV.     State Law Claims (Counts I, II, III, IV, and X)**

The Cherneys assert five counts based on state law—intentional infliction of emotional distress, negligent infliction of emotional distress, assault, battery, and loss of consortium.  Defendants assert that they are entitled to summary judgment on Counts I, II, III, IV, and X[14] because the City of Burnsville and its officers are protected by the defense of official immunity.[15]  Specifically, Defendants assert that the Cherneys cannot establish that any Defendant acted with malice.

Under Minnesota law, public officials are automatically entitled to official immunity from state law claims when their duties require the exercise of discretion, so long as the officer is not guilty of a willful or malicious wrong.  *Johnson v. Morris*, 453 N.W.2d 31, 41-42 (Minn.1990); *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988).  Thus, to determine whether official immunity is available in any given context requires a determination of whether the alleged acts were discretionary or ministerial and whether the alleged acts were malicious or willful.  *Davis v. County of Hennepin*, 559 N.W.2d 117, 122 (Minn. Ct. App. 1997).

---

[14]     As to the Cherneys' loss of consortium claim, Defendants also assert that it is derivative in nature and irrelevant at summary judgment (meaning that if the Cherneys cannot recover on their tort claims, Steven Sr. cannot recover for his loss of consortium). The Cherneys agree that the loss of consortium claim is irrelevant at summary judgment. Although true, the Court notes that this claim, along with the other state law claims as explained further below, is not dismissed based on the defense of official immunity.

[15]     Citing *Fedke v. City of Chaska*, 685 N.W.2d 725, 731 (Minn. Ct. App. 2004), Defendants contend that the City of Burnsville enjoys the official immunity afforded its officers based on vicarious official immunity.

Malice, in the official immunity context, means intentionally committing an act that the official has reason to believe is prohibited.  This is an objective inquiry that examines the legal reasonableness of an official's actions.  *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).  To overcome a defense based on official immunity, a plaintiff cannot rely on "bare allegations of malice"; rather, a plaintiff must present specific facts evidencing bad faith.  *Harlow*, 457 U.S. at 817.

The Court agrees with Defendants that the officers' actions were discretionary and not ministerial.  However, viewing the evidence in the light most favorable to the Cherneys, the Court finds that there are genuine issues of material fact with respect to the issue of malice that preclude summary judgment on these claims.  The Cherneys have testified that they believe Officer Smith conducted the pat-search of Debra in the manner that he did to intentionally embarrass her.  In addition, Debra testified that Officer Smith started to frisk her groin area and then when she complained, he stepped back and rolled his eyes at her and said "Ma'am.  Relax.  Okay," (Tindal Aff., Ex. 8 at 2), and then frisked her groin area again.  Given this evidence of Officer Smith's alleged intent, the Court denies Defendants' motion with respect to Counts I, II, III, IV, and X based on official immunity.

### A.    Intentional and Negligent Infliction of Emotional Distress (Counts III and IV)

Defendants also move for summary judgment on the Cherneys' intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") claims on their merits because they assert that the Cherneys cannot provide

sufficient evidence to support the elements of either claim.  Specifically, Defendants

contend that the evidence does not show that the pat-search constitutes "extreme and

outrageous" conduct, that the Cherneys suffered severe emotional distress, and that the

Cherneys suffered a physical manifestation of emotional distress.

In response, the Cherneys assert that there is a genuine issue of material fact with

respect to whether Debra suffered severe emotional distress resulting from the contested

pat-search.  The Cherneys point to physician's notes in Debra's medical chart along with

this physician's update provided on November 1, 2007, which conclude that Debra has

PTSD and has been on medication for PTSD and insomnia.  The physician also

concluded that Debra's condition was caused by a situation involving the Burnsville

Police.  In addition, the Cherneys assert that Debra was unable to work for a period of

time.

Under Minnesota law, there are four elements for an IIED claim:  (1) the conduct

must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the

conduct must cause emotional distress; and (4) the distress must be severe.  *Hubbard v.*

*United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983) (citing Restatement

(Second) of Torts § 46(1) (1965)).  To establish a claim for NIED under Minnesota law, a

plaintiff must prove the four elements of a negligence claim—duty, breach, injury, and

causation.  *Engler v. Ill. Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005).  In

addition to the elements of negligence, a plaintiff claiming NIED must also establish that

he or she:  (1) was within a zone of danger of physical impact; (2) reasonably feared for

his or her own safety; and (3) suffered severe emotional distress with attendant physical

manifestations.  *Id*.  The physical manifestation requirement "is designed to assure the genuineness of the emotional distress."  *Silberstein v. Cordie*, 474 N.W.2d 850, 857 (Minn. Ct. App. 1991).

Viewing the evidence in the light most favorable to the Cherneys, the Court agrees with the Cherneys that there are genuine issues of material fact with respect to whether they have established the necessary elements for an IIED claim under Minnesota law.  A reasonable jury could conclude that Officer Smith's pat-search of Debra's groin area, in light of his training on this type of search and in light of Debra and Steven Sr.'s testimony regarding Officer Smith's alleged intent, was extreme and outrageous and that Debra's distress realized was severe.  Given this, the Court denies Defendants' motion with respect to the Cherney's IIED claim.

But the Court finds that based on the record before the Court, the NIED claim fails because the Cherneys cannot establish that Debra suffered severe emotional distress with physical manifestations.  Here, there is no evidence that Debra suffered physical injury. *See Wilson v. Sears, Roebuck and Co.*, 757 F.2d 948, 953 (8th Cir. 1985) (affirming district court's finding that plaintiff's PTSD and its various manifestations were not compensable under Nebraska law).  Therefore, the Court grants Defendants' motion with respect to the Cherneys' NIED claim.

## V.      Officers Smith and Powers' Defamation Claim

Officers Smith and Powers assert that the Cherneys' allegations that their actions amounted to "sexual assault" are defamatory *per se*.  To establish that a statement is defamatory under Minnesota law, the plaintiff must demonstrate that the statement is

false, was communicated to a third party, and tends to harm the plaintiff's reputation. *Bol v. Cole*, 561 N.W.2d 143, 146 (Minn. 1997). A true statement cannot be defamatory. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn. 1980). Under Minnesota law, false accusations of criminal activity are defamatory *per se*. *See Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987).

Here, Debra testified that she told people that she was "inappropriately touched." (Tindal Aff., Ex. 3 at 98-99.) However, the undecided questions of material fact regarding whether the pat-search was conducted in an improper manner and constituted excessive force prevents the Court from determining as a matter of law whether Debra's statements were true or false and defamatory *per se*. Therefore, the Court denies Defendants' motion for summary judgment as to their claim for defamation.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment (Doc. No. 13) is **GRANTED IN PART AND DENIED IN PART**, as follows:

    a. All claims against Jane Doe and Richard Roe contained in the Complaint are **DISMISSED WITH PREJUDICE**.

    b. Defendants' Motion with respect to the Cherneys' assault claim contained in Count I of the Complaint is **DENIED**.

    c. Defendants' Motion with respect to the Cherneys' battery claim contained in Count II of the Complaint is **DENIED**.

      d.      Defendants' Motion with respect to the Cherneys' intentional infliction of emotional distress claim contained in Count III of the Complaint is **DENIED**.

      e.      Defendants' Motion with respect to the Cherneys' negligent infliction of emotional distress claim contained in Count IV of the Complaint is **GRANTED,** and the claim is **DISMISSED WITH PREJUDICE**.

      f.      Defendants' Motion with respect to the Cherneys' 42 U.S.C. § 1983 claim based on excessive force contained in Count V of the Complaint is **DENIED**.

      g.      Defendants' Motion with respect to the Cherneys' 42 U.S.C. § 1983 claim based on the failure to prevent a constitutional violation contained in Count VI of the Complaint is **GRANTED,** and the claim is **DISMISSED WITH PREJUDICE**.

      h.      Defendants' Motion with respect to the Cherneys' 42 U.S.C. § 1983 claim against the City of Burnsville (the *Monell* claim) contained in Count VII of the Complaint is **GRANTED,** and the claim is **DISMISSED WITH PREJUDICE**.

      i.      Defendants' Motion with respect to the Cherneys' 42 U.S.C. § 1983 claim based on conspiracy contained in Count VIII of the Complaint is **GRANTED,** and the claim is **DISMISSED WITH PREJUDICE**.

j.      Defendants' Motion with respect to the Cherneys' negligent training claim contained in Count IX of the Complaint is **DENIED**.

k.      Defendants' Motion with respect to the Cherneys' loss of consortium claim contained in Count X of the Complaint is **DENIED**.

l.      Defendants' Motion with respect to Officer Smith and Officer Powers' defamation *per se* claim contained in their Counterclaim is **DENIED**.


Dated:  January 8, 2008                    s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           Judge of United States District Court